**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CINDY SPICUZZA, individually and as Administratrix of the Estate of CHRISTINA SPICUZZA, deceased,<br><br>Plaintiffs,<br><br>v.<br><br>UBER TECHNOLOGIES, INC., RASIER, LLC, and RASIER-PA, LLC,<br><br>Defendants. | Case No.   2-23-cv-1608<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Cindy Spicuzza, individually and as Administratrix of the Estate of Christina Spicuzza, deceased, brings this Complaint for damages against Defendants Uber Technologies, Inc., Rasier LLC, and Rasier-PA, LLC (collectively, "Uber" or "Defendants"), and alleges as follows:

## INTRODUCTION

1.      This action arises from the untimely and wholly preventable death of Christina Spicuzza, a 38-year-old mother of four, on February 10, 2022, whom Uber matched with a violent criminal after he used his girlfriend's Uber account to order an Uber fare through Uber's mobile application. Despite Uber knowing its drivers—essential players in the wildly profitable Uber enterprise—are at high risk of violent attacks by passengers, Uber abdicated its duty to protect its drivers from that known and foreseeable risk by failing to implement simple, available, and effective safety measures.

2.      Since its founding in San Francisco in 2010, Uber has grown exponentially into a multibillion-dollar enterprise with operations worldwide. Uber's phenomenal growth is primarily due to its success in shifting the costs associated with doing business to its drivers, its evasion of regulations governing other for-hire driving services, and lax security screening processes.

3.      For decades, simple, and inexpensive safety measures have been utilized that protect for-hire drivers from assault, including the installation of barriers between the front and back seats. Yet Uber did nothing to ensure Ms. Spicuzza—who was driving a vehicle rented through one of Uber's suggested car-rental vendors—had the benefit of such protection, nor did it even warn Ms. Spicuzza of the importance of such protections.

4.      Moreover, although Uber has developed and commercialized some of the most sophisticated data collection and analysis in the world to screen out potentially violent or dangerous drivers from offering rides, here, it failed to employ basic identity-verification technology to screen out the customer who murdered Ms. Spicuzza. Moreover, Uber discourages its drivers from using their own judgment to avoid potentially unsafe situations by penalizing them for failing to accept rides.

5.      As a direct and proximate result of Uber's failure to take available and simple steps to protect Ms. Spicuzza from unverified, potentially violent riders, she was held at gunpoint, unable to exit or call for help, forced to drive her violent attacker under his instructions, forced to give him her phone, and was shot to death.

6.      Uber's apathy towards the safety of its drivers created the opportunity for Ms. Spicuzza's murder, leading to the untimely loss of her life, and forcing her long-term life partner and fiancé to explain to their young children why their mother was never coming home again.

## PARTIES

7.      Plaintiff Cindy Spicuzza is an adult and the surviving biological mother of the deceased Christina Spicuzza. At all relevant times, she was a resident of Allegheny County in the Commonwealth of Pennsylvania. Plaintiff Cindy Spicuzza is a citizen of Pennsylvania.

8.      The Estate of Christina Spicuzza has been filed for probate in Allegheny County, Pennsylvania, and remains pending (*In Re: Estate of Christina Spicuzza*, Case No. 022300187 (Pa. Ct. Com. Pl., Allegheny Cnty.)). Christina Spicuzza's death was a result of a violent act committed by an Uber rider during a fare on February 10, 2022, in Allegheny County, Pennsylvania. At all times before her death, Christina Spicuzza was a citizen and resident of Pennsylvania.

9.      On May 4, 2023, Plaintiff Cindy Spicuzza was issued a Letters of Administration by the Register of Wills of Allegheny County, appointing her as the Administratrix and Personal Representative of the Estate of her deceased daughter, Christina Spicuzza. A true and correct copy of the Letters of Administration is attached hereto as **Exhibit A**.

10.     Cindy Spicuzza, as Administratrix and Personal Representative of the Estate of Christina Spicuzza, brings this action on behalf of the Estate and on behalf of all persons entitled to recover damages under Pennsylvania's Wrongful Death and Survival Action statutes. Pa. Cons. Stat. §§ 8301-8302.

11.     Defendant Uber Technologies, Inc. ("Uber Technologies") is a Delaware Corporation with its principal place of business in San Francisco, California. Uber operates nationally and internationally in over 10,000 cities, including Pittsburgh, Pennsylvania.

12.     Defendant Rasier LLC ("Rasier") is a Delaware Limited Liability Company with its principal place of business in San Francisco, California. Rasier is a wholly-owned subsidiary of Uber Technologies.

13.     Defendant Rasier-PA, LLC ("Rasier-PA") is a Delaware Limited Liability Company with its principal place of business in San Francisco, California. Rasier-PA is a wholly-owned subsidiary of Uber Technologies. Upon information and belief, together with Rasier, Rasier-PA is the party that directly contracts with drivers and provides rides to Uber app users. Uber Technologies, Rasier, and Rasier-PA may be collectively referred to herein as "Uber" or "Defendants."

## JURISDICTION AND VENUE

14.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, and the Plaintiff and Defendants are residents of different states.

15.     The Court has personal jurisdiction over Defendants as Defendants conduct substantial business activities in this district. The causes of action arise from these business activities such that exercising personal jurisdiction does not offend due process.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## STATEMENT OF FACTS

17.     Uber is a transportation and software company with "a technology platform that uses a massive network, leading technology, operational excellence, and product expertise to power movement from point A to point B."[1] In other words, Uber is a ride-sharing company with a platform-based application that allows riders to hail a ride and its drivers to charge fares and get paid for conveying passengers on trips.

---

[1] Uber Technologies Inc., Annual Report, Form 10-k (Dec. 31, 2021) ("Annual Report"), at 4.

18.     Uber's "massive, efficient, and intelligent network consists of tens of millions of Drivers, consumers, Merchants, shippers and carriers, as well as underlying data, technology, and shared infrastructure."[2] Uber is available in approximately 72 countries around the world, principally in the United States.[3]

19.     Uber boasts that its ride-share platform is "built with expertise that allows [it] . . . [to] deliver safety and trust" and that "safety is designed into the experience."[4]

20.     However, Uber never kept its promises to those using its platform, including its driver, Ms. Spicuzza.

**A.      The Risks and Dangers Associated with the Occupation of an Uber Driver Are Well-Known to Uber.**

21.     The occupation of a driver for a ride-hailing service, whether the ride is hailed by a phone call, by an app, or by an extended arm on a street corner, is among the most dangerous in the United States.[5]

22.     As a "gig worker" Ms. Spicuzza faced even more danger than taxi and limousine workers, or regular drivers, in part because of the unique pressure gig workers feel to accept passengers in order to turn a profit, the lack of information about those customers, and the ride-share app's engineered structure of incentives and disincentives, which push drivers to make decisions based on economic factors—many of which are manipulated by Uber.

---

[2] *Id.*

[3] *Id.*

[4] *Drive With Confidence*, Uber, https://www.uber.com/us/en/drive/safety/ (last visited Sept. 1, 2023).

[5] *See* Cammie K. Chaumont Menedez, et. at., *Work-Related Violent Deaths in the US Taxi and Limousine Industry 2003 to 2013*, 56 (8) J. OCCUP. ENVIRON MED., 768-747 (2017); NIOSH/OSHA, *NIOSH Fact Facts: Taxi Drivers—How to Prevent Robbery and Violence* (Nov. 2019), https://www.osha.gov/sites/default/files/publications/OSHA3976.pdf.

23.    Uber has been well aware of these dangers to their drivers. For instance, in 2016, sixteen Uber drivers were murdered in Brazil and many more were assaulted.[6]

24.    Uber has previously investigated the problem of passenger assaults on its drivers (as well as the highly publicized problem of Uber-driver assaults on passengers). Uber's own investigation found that its drivers were about as likely to be the victims of sexual assault by passengers as to be the perpetrators, and that roughly the same number of Uber drivers and passengers were victims of fatal physical assaults while using the company's platform.[7] One criminologist characterized the report as "highly alarming."[8]

25.    After Uber released the highly alarming report, Uber's chief legal officer, Tony West, callously chalked the statistics up to the costs of doing businesses—"Each of those incidents represents an individual who has undergone horrific trauma . . . . But I'm not surprised by those numbers."[9]

26.    In 2022, Uber found that the number of fatal physical assaults related to the Uber platform increased 18% from the period 2017–2018 to 2019–2020.[10] The number of fatal physical assaults increased, even though Uber logged far fewer trips in 2020 than 2019 as a result of the

---

[6]    Mike    Isaac*,    *How    Uber    Got    Lost*,    N.Y.    Times    (Aug.    23,    2019), https://www.nytimes.com/2019/08/23/business/ how-uber-got-lost.html.

[7]    Uber,    *2017-2018 U.S. Safety Report* ("2017-2018 Safety Report"), https://www.uber-assets.com/image/upload/v1575580686/Documents/Safety/UberUSSafetyReport_201718_FullR eport.pdf?uclick_id=c04021cc-6ffc-463a-8961-5b34977239c8 (last accessed Aug. 8, 2022), at 57.

[8] Aarian Marshall, *A Criminologist Says Uber's Crime Report is 'Highly Alarming'*, Wired (Dec. 6, 2019), https://www.wired.com/story/criminologist-uber-crime-report-highly-alarming/.

[9] Jason Abbruzzese, *Uber Riders and Drivers Share Fears About Safety After Company Releases Assault Numbers*, NBC News (Dec. 6, 2019), https://www.nbcnews.com/tech/tech-news/uber-riders-drivers-share-fears-about-safety-after-company-releases-n1097446.

[10]    Uber,    2019-2020    U.S.    Safety    Report    ("2019-2020    Safety    Report"), https://uber.app.box.com/s/vkx4zgwy6sxx2t2618520xt35rix022h?uclick_id=eb1a9259-951c-452b-803c-f7899b67e363, at 54.

COVID-19 pandemic.[11] Notably absent from Uber's 2022 investigation is an investigation into the number of non-fatal physical assaults.

27.     A recent Gig Workers Rising report found that, since 2017, at least fifty app-based drivers have been killed on the job in the United States, including twenty-five Uber drivers.[12] The true toll, however, is certainly higher because of a lack of systematic reporting and disclosure. The researchers relied solely on publicly available data such as news articles, company press releases, and even postings from deceased workers' family members on crowdfunding websites such as GoFundMe.[13]

28.     Uber is well-aware that many of its drivers have been assaulted, robbed, or carjacked. In 2021 alone, there were 124 reported carjackings of ride-share drivers.[14] Of the drivers involved in those carjackings, eleven drivers died due to the assaults and dozens more were severely or permanently injured. Most alarming is that seventy-five percent of the victimized drivers were paired with their assailants through the ride-sharing app's algorithm.[15]

29.     Sadly, the news is replete with stories of Uber drivers being robbed and/or murdered by violent passengers.[16] And yet, Uber has not taken sufficient action to protect its drivers from dangerous passengers.

---

[11] *Id.*

[12] *See* Gig Workers Rising, *Death and Corporate Irresponsibility in the Gig Economy: An Urgent Safety Crisis* (Apr. 6, 2022) ("Gig Worker Rising Report"), https://www.gigsafetynow.com/_files/ugd/af5398_e1b49d831a0149a08df4be57c612ae88.pdf, at 10.

[13] *Id.* at 10-11.

[14] Dara Kerr, *Uber and Lyft Drivers are Being Carjacked at Alarming Rates*, TheMarkup (July 22, 2021), https://themarkup.org/working-for-an-algorithm/2021/07/22/uber-and-lyft-drivers-are-being-carjacked-at-alarming-rates.

[15] *Id.*

[16] *DC Police Looking for Person They Say Carjacked, Kidnapped Uber Driver at Gunpoint*, 7News (Feb. 4, 2022), https://foxbaltimore.com/news/local/dc-police-looking-for-person-they-say-carjacked-kidnapped-uber-driver-at-gunpoint; *Uber Driver Had Gun Pointed at His Head*

30.     Instead of protecting its drivers, Uber relies on an exploitative business model to avoid any responsibility for its drivers. Because Uber classifies its drivers as independent contractors, Uber does not provide its drivers the safety and health benefits of traditional employees, including workers' compensation and disability insurance.[17] As such, Uber drivers and their families often receive nothing from Uber when drivers are harmed on the job.[18]

31.     At the same time that Uber subjects its drivers to significant occupational risks with minimal to no safety protections, Uber collects billions of dollars a year in revenue from their labor.[19]

32.     Due to the rise of these startling statistics with seemingly no plans to protect its drivers from the occupational risks they face while driving for Uber, the United States Congress felt it necessary to get involved. On May 31, 2022, Congress issued a letter to Dara Khosrowshahi, Uber's Chief Executive Officer, demanding written responses to various questions related to Uber's poor health and safety record—"We write concerning the health and safety of Uber's app-

---

*During Attempted Robbery*, CBS Miami (Aug 26, 2021), https://miami.cbslocal.com/2021/08/26/uber-driver-attempted-robbery-gunpoint/; Kaitlin Rust, *Uber Driver Robbed By Passenger, Fired for Having* Gun, Fox8 (Jul. 15, 2021), https://www.fox8live.com/2021/07/16/uber-driver-robbed-gunpoint-by-passenger-near-pontchartrain-park/; Jozelyn Escobedo & David Goins, *Affidavit: Ride-Share Driver Who Died was Choked, Stabbed, Ran Over Multiple Times by 21-Year-Old Man*, WFAA (last updated Jan. 12, 2021), https://www.wfaa.com/article/news/crime/ride-share-driver-stabbed-and-ran-over-by-amazon-fulfillment-center-worker/287-b2dc0ecb-382f-440b-87b6-69b0372c7881; Brook Wolford, *Uber Driver Stabbed to Death by Couple Riding in the Back Seat, Washington Cop Say*, The News Tribune (last updated Dec. 21, 2020), https://www.thenewstribune.com/news/state/washington/article247966055.html; Gina Gook et al, *Uber Passenger Shoots, Kills Driver and Man Sharing Ride in Maryland: Police* (last updated Aug. 29, 2019) https://www.nbcwashington.com/news/local/suspect-high-on-pcp-shot-killed-uber-driver-and-passenger-in-oxon-hill-police/132266/.

[17] Gig Worker Rising Report, *supra* note 12, at 13-14.

[18] *Id*.

[19] Annual Report, *supra* note 1, at 54.

based delivery workers. Every day, ride-share drivers repeatedly interact with strangers, leaving them vulnerable to violent assault and even death."[20]

33.     Despite its knowledge of the significant occupational risk of assault, robbery, injury, or death, Uber does not equip its drivers with reasonably available tools and options to avoid these dangerous situations or passengers. Indeed, Uber's driver rating and payment models have the opposite effect by putting economic pressure on drivers to accept all fares despite potential red flags.

**B.     Uber Fails to Take Reasonable Steps to Protect Its Drivers from the Foreseeable Risks of Passenger Violence.**

34.     Even though Uber has exclusive control over safety features of its ride-sharing platform, Uber takes a hands-off approach when it comes to monitoring the safety of driver–passenger interactions, failing to employ reasonable safety measures to protect its drivers, including Ms. Spicuzza, from customers intent on doing them harm.

**i.     Physical Barriers Protect Drivers but Uber Does Nothing to Ensure their Installation and Use.**

35.     The risks of passenger assaults on drivers can be mitigated. For decades, OSHA has recommended that companies offering for-hire car services employ physical precautions to protect drivers from the risk of assaults by passengers. Among the controls long recommended by OSHA are physical barriers between drivers and passengers.[21]

---

[20] Senator Edward J. Markey & Senator Elizabeth Warren, *Letter to App Based Delivery Companies*,                    (May                    31,                    2022), https://pressley.house.gov/sites/pressley.house.gov/files/22.05.31%20Letter%20to%20Uber.pdf.
[21] NIOSH/OSHA, *NIOSH Fact Facts: Taxi Drivers—How to Prevent Robbery and Violence* (Nov. 2019), https://www.osha.gov/sites/default/files/publications/OSHA3976.pdf.

36.     For an individual to drive for Uber, driver applicants' vehicles must be inspected and approved by Uber.[22] Vehicles are inspected as part of the driver's initial application and then again annually.[23] Uber's inspection ensures the driver's car meets Uber's standards for safety, presumably to protect passengers—such as functioning tires, doors, horns, brakes, lights, seatbelts, and turn signals.

37.     Uber drivers who do not own a vehicle or whose personal vehicle does not meet Uber's safety requirements must rent a car that meets Uber's basic safety requirements in order to be an Uber driver. In such event, Uber recommends renting a vehicle through Uber's "Vehicle Marketplace."[24] This "Vehicle Marketplace" connects Uber drivers with Uber-approved vehicles available to rent from an Uber-approved rental partner.[25]

38.     Uber even encourages drivers to rent vehicles through its Vehicle Marketplace by offering various incentives. Vehicles rented through Uber-approved rental partners come road ready with insurance, unlimited mileage, and warranties, all at a discounted base rate rental fee. Additionally, Uber offers cash promotions on vehicles that drivers rent through the Vehicle Marketplace in the form of Uber Cash that can be applied to future rentals, Uber rides, and Uber Eats deliveries. Finally, Uber even offers a rewards program where drivers can earn additional money for completing a certain number of trips in a rental car. For example, if a driver completes 70 trips in a week, they can earn an additional $185 dollars, and if they complete 120 trips in a

---

[22]     *Requirements for Uber Vehicles – Pittsburgh, PA*, TheRideSharePro, https://theridesharepro.com/uber-vehicle-requirements/pittsburgh-pa/ (last visited Sept. 1, 2023).
[23] *Id.*
[24]     *Can I Use a Rental Card To Drive?*, Uber, https://help.uber.com/driving-and-delivering/article/can-i-use-a-rental-car-to-drive-?nodeId=d5dd1064-9100-47ee-a37f-404bccea630e (last visited Sept. 1, 2023).
[25] *Id.*

week they can earn an additional $305. Thus, by completing trips, drivers can have Uber pay off

the rental for them, all while collecting their normal wages and tips.

39.     Despite knowing the risks of passenger assaults on its drivers and its control over

vehicle safety features, Uber does not provide or require any sort of safety measures in its rental

cars to protect its drivers—features like a physical partition between the driver and passenger

seating.

> **ii.     Uber Fails to Utilize Its Enormous Technological Capabilities to Screen or Implement Identity Checks of New Customers.**

40.     Uber does not verify the identity of its passengers, despite having the technology

and ability to do so.

41.     Uber requires prospective Uber drivers to pass background checks before they can

begin accepting rides through the Uber application. Uber's 2017–2018 US Safety Report boasts:

> Every US driver undergoes an annual Motor Vehicle Record (MVR) review and a thorough criminal history background check before their first trip. The ridesharing industry is subject to a diverse array of laws and regulations specifying how potential drivers must be screened and/or whether those drivers are qualified to drive on the Uber platform. While background check requirements and other driver eligibility limitations in the US vary considerably by state and even by city, Uber's own process exceeds these requirements in several important ways.
> . . .
> Uber's background-check process is very rigorous. During 2017 and 2018, more than one million prospective drivers did not make it through Uber's screening process . . .
> Uber will disqualify individuals with any felony convictions in the last 7 years. If we identify a report for **certain serious criminal convictions**—including sexual assault, sex crimes against children, murder/homicide, terrorism, and kidnapping— **at any time** in the person's history, the potential driver will be disqualified according to our standards.
> . . .
> Beyond performing annual background check reruns, we were the first US ridesharing company to implement continuous driver screening technology, which monitors and flags new criminal offenses through a number of data sources and then notifies us so we can take action to ensure that every driver continues to meet

our high standards. Since we launched this technology, more than 40,000 drivers have been removed from the app due to continuous screening.[26]

42.    In contrast, prospective passengers are not subject to any form of background check or identity verification process to open an Uber account. To open an account as a passenger, an individual need only input a phone number, email address, and payment method. Permitted payment methods include credit and debit cards, PayPal, Venmo, digital wallets, and Uber gift cards. Uber allows users to scan or upload a photo of a credit card through the mobile application. This entire process can be completed in a matter of minutes, and provides no protection against fabricated and/or untraceable passenger information.

43.    Uber has elected not to screen new customers or implement identity checks despite its knowledge that drivers are as likely as passengers to suffer a fatal physical assault during an Uber ride. Indeed, while Uber recognizes the need for vigorous background checks for drivers, individuals opening a new account are subject to essentially no screening before they get into the same enclosed space with an unprotected driver who has his or her back to the passenger and eyes focused on the road. The only screening Uber appears to care about is the passengers' ability to provide a valid payment method.

44.    Unsurprisingly, drivers have long complained about Uber's failure to protect them from the passengers with whom they are matched with via the Uber app. One ride-share driver who was shot in Detroit told the local news that the rideshare companies provide "[n]o background check on [riders], no copy of an ID or anything. The two rideshare companies [Uber and Lyft] have got to do something about that, cause it's scary for us."[27]

---

[26] 2017-2018 Safety Report, *supra* note 7, at 11.
[27] *See* Heather Catallo, *Rideshare Risks: Dangers Facing Uber and Lyft Drivers*, WXYZ (Mar. 13, 2018),

45.     Uber also has massive data collection and analysis capabilities that could be harnessed to identify and screen out users using fraudulent or stolen identities—if it chose to do so.

46.     For example, Uber has touted a new initiative called "Uber Movement," which "shares anonymized data aggregated from over ten billion trips to help urban planning around the world."[28] Uber Movement offers several products to city officials, planners, and consultants, including datasets measuring zone-to-zone travel times across cities, street speeds, and the volume of activity on mobile devices in a given location.[29]

47.     Uber has also used its technological capabilities for purposes other than urban studies or lawful profit-making. In 2017, it was reported that Uber had created software internally dubbed "Hell," which, through fake Lyft accounts and fake ride requests, was able to determine which of its drivers were also driving for Lyft and when they were most likely to log into the Lyft app, and then offer them Uber incentives to deter them from doing so.[30]

48.     It was separately reported that, since 2014, Uber had been using another program internally referred to as "Greyball" to "identify and circumvent officials who were trying to clamp down on the ride-hailing service" by using data collected from the Uber app and other techniques.[31]

---

https://www.wxyz.com/news/local-news/investigations/rideshare-risks-dangers-facing-uber-and-lyft-drivers.

[28]    Jordan   Gilbertson,   *Introducing   Uber   Movement*,   Uber   (Jan.   9,   2017), https://www.uber.com/newsroom/introducing-uber-movement-2/.

[29] *Id.*

[30] *See* Catherine Shu, *Uber Reportedly Tracked Lyft Drivers Using a Secret Software Program Named "Hell,"* TechCrunch (April 13, 2017), https://www.inverse.com/article/30302-hell-uber-driver-stalking-app.

[31] Mike Isaac, *How Uber Deceives Authorities Worldwide*, The New York Times (Mar. 3, 2017), *available   at*   https://www.nytimes.com/2017/03/03/technology/uber-greyball-program-evade-authorities.html.

These techniques included showing officials a fake version of the app with fake animated cars on a map to evade detection.

49.     Uber's Privacy Notice further discloses that it collects a wide variety of individual rider data, including: user profile information such as: name, email address, mobile number, profile picture, and payment or banking information; demographic data such as: date of birth, age, gender, and occupation; location data such as: precise or approximate location data from an individual's mobile device, data from the time a trip is requested until finished; transaction data such as: the type of services requested, trip details (including date and time, requested pick-up and drop-off addresses), and payment transaction information; and device data such as: hardware models, device IP addresses, operating systems, versions, software, device motion data, and mobile network data.[32]

50.     Given Uber's state-of-the-art data triangulation capabilities, it could use data pattern analysis to "red flag" miscreant passengers utilizing false or stolen identities or bogus payment information to hire Uber drivers, but did not do so.

iii.     **Uber Intentionally Provides Drivers with as Little Information as Possible on Potential Riders.**

51.     In addition to Uber's failure to use its current background check procedures for drivers to also apply to passengers or use its data analysis capabilities to screen out dangerous passengers, Uber enacted policies and procedures designed to ensure minimal information is provided to drivers about who is getting in their car, precluding any meaningful decision-making

---

[32]    *Uber Privacy Notice*, Uber (last updated Oct. 13, 2022), https://www.uber.com/legal/ro/document/?country=united-states&lang=en&name=privacy-notice#kix.layne5m441d5.

by the drivers as to whether a passenger might be dangerous and as to whether they want to face the risk.

52.     Indeed, Uber informs potential riders that they are offered near complete anonymity when requesting a ride via the Uber app stating: "[w]e limit what drivers can see about you."[33] "At each stage of the trip, drivers only see what they need to know to pick you up and get you to your destination," nothing more.[34]

53.     When an Uber driver is notified of a ride request, they may get the rider's first name, Uber rating, the length of the ride to the requested destination, the approximate pickup location, and the drop-off location.[35] Drivers are given no further information, such as a photo of the passenger or the passenger's full name.[36] With no photo and no full name, drivers have no way of verifying that the person who requested the ride is the person who is getting in the car.

54.     In this way, and for the additional reasons explained below, Uber has designed a system that places the burden of passenger verification entirely on the drivers, but provides them virtually no ability to confirm the actual riders' identities or to decline rides without incurring penalties.

**iv.     Uber's Perverse Incentives Put Drivers at Risk.**

55.     If a driver is uneasy about a passenger and elects not to pick that passenger up, Uber penalizes the driver.

---

[33]     *We    Limit    What    Drivers    Can    See    About    You*,    Uber, https://privacy.uber.com/privacy/viewwhatdriversees?show_header=true (last visited Sept. 1, 2023).
[34] *Id.*
[35] *Id.*
[36] *Id.*

56.     Uber uses a system of perverse incentives and penalties that restrict drivers' autonomy over their personal safety.

57.     For instance, Uber tracks a driver's acceptance rate, *i.e.*, the number of ride requests a driver accepts divided by the total number of ride requests a driver receives while online.[37] Uber tells its drivers that their rate should be above 80%, but that the closer to 100%, the better— incentivizing drivers to accept any ride that comes their way, regardless of whether they feel comfortable doing so.[38] Thus, it is clear that Uber's stance is that drivers should blindly accept requests from everyone, no matter what, or face a potential loss of good standing and income.

58.     By tracking driver acceptance rates, Uber pressures drivers into accepting passengers in any event, regardless of driver safety. If a driver fails to accept enough requests, Uber will send the driver a warning and will log drivers out of the app if they don't accept several rides in a row. Drivers also face the risk of being suspended from the app if they have a high cancellation rate.

59.     For example, on October 20, 2021, Adebayo Adeyemo, a Chicago-based driver was shot while driving for Uber.[39] According to Mr. Adeyemo, he felt pressured not to cancel his ride after he picked up his passenger, even after they made comments about his race because Mr. Adeyemo knew Uber penalizes drivers who cancel rides, so he continued driving his passengers despite their racist remarks.[40]

---

[37] *What Are Acceptance Rates*, Uber, *https://help.uber.com/driving-and-delivering/article/what-are-acceptance-rates?nodeId=5cccf675-778e-4495-94e7-27c619d20990* (last visited Sept. 1, 2023).
[38] Alex Rosenbalt, *The Truth About How Uber's App Manages Drivers*, Harvard Business Review (Apr. 6, 2016), https://hbr.org/2016/04/the-truth-about-how-ubers-app-manages-drivers.
[39] Megan Hickey, *Driver Sues Uber After Passenger Shot Him, Says He Felt Pressured Not To Cancel Ride Despite Sense Of Danger*, CBS Chicago (Dec. 29, 2021), chicago.cbslocal.com/2021/12/29/uber-driver-shot-by-passenger-lawsuit.
[40] *Id.*

60.     In addition to penalizing drivers for declining rides, Uber also incentivizes drivers to accept as many rides as possible by offering a rewards program, Uber Pro, to take advantage of more earnings opportunities and possible savings.[41] However, to qualify for the benefits of Uber Pro, a driver must maintain a driver rating of 4.7, a cancellation rate of less than 4 percent, and an acceptance rate of at least 85 percent.[42] As such, Uber pressures drivers to accept as many rides as possible in order maintain their Uber Pro status.

61.     Finally, Uber offers flat bonuses or increased payouts per ride when drivers complete a certain number of trips in a row over a certain period of time or complete rides at specific times of day.[43] Because payouts to drivers are so low in relation to their time and costs, these "bonuses" or increased payouts may be the difference between profitability or not after the driver's expenses are deducted.

62.     Uber uses perverse psychological tricks to incentivize drivers to complete as many rides as possible, making clear to its drivers that they should ignore their instincts and pick up every rider that requests a ride.

63.     Uber could have designed its incentive system to permit drivers to decline rides for any reason, or at a minimum, for reasons related to safety concerns or inconsistency between the requesting app user and the passenger who shows up.

---

[41] *Introducing Uber Pro*, Uber, https://www.uber.com/au/en/drive/uber-pro/ (last visited Sept. 1, 2023).

[42] Katrina Elwood, *Uber Makes Checking Rider's Age a Driver's Job. After 12-Year-Old Girl's Suicide, Some Don't Want That Responsibility*, Orlando Sentinel (Jun. 26, 2022), https://www.orlandosentinel.com/news/os-ne-uber-drivers-underage-policy-enforcement-20190626-y6agkckh7baeliuomlcmlkmeq-story.html.

[43] Ezra Dubroff, *Uber Quest Review: Trips, Tricks, Strategy, Hacks & Earnings*, RideShareGuy (Apr. 12, 2022), https://www.uber.com/au/en/drive/uber-pro/; Christian Perea, *Lyft Ride Streak Bonuses and Uber Consecutive Trips Boost*, Ride Share Guy (Jan. 17, 2021), https://therideshareguy.com/lyft-streak-bonuses-and-uber-consecutive-trip-boost/#uber-consecutiv.

v.      **Uber's Current Driver "Safety" Features Are Woefully Inadequate.**

64.     In light of the foreseeable safety risks its drivers face, Uber has provided its drivers with minimal and inadequate safety features which have been criticized by driver advocacy groups. Cherri Murphy, a former Lyft driver and spokeswoman for Gig Workers Rising, has stated "Uber executives want you to think that throwing numbers and statistics at the reporters will fool us into believing Uber is safe for workers . . . but workers have long known that the safety features they speak of are fake, and fail to keep workers safe."[44]

65.     For instance, Uber has provided its drivers with access to an "Emergency Button" on the Uber app that places a 911 call using the cellphone's dialer and shares the car's make and model, license plate number, and cellphone's GPS location with emergency responders.[45]

66.     To use it, a driver must access the "Safety Toolkit" by tapping the shield icon on the Uber app's map screen, tap "911 assistance," and then tap the button "call 911."[46]

67.     When facing a situation involving a dangerous passenger, however, the Emergency Button is effectively unusable because it takes a driver multiple steps for the Uber app to dial 911. The Emergency Button still uses the driver's normal phone dialer to dial 911 instead of making a call over the Uber app's internet connection. Thus, it is unclear that using this feature would be faster or more effective than a driver simply dialing 911 themself.

68.     Additionally, if the phone is displayed on the car's dashboard, as was the case for Ms. Spicuzza and for many of Uber's drivers, a violent passenger can simply reach for the phone and take it from the driver before any attempt can be made to use this "safety" feature. As such, in

---

[44] Kellen Browning, *Uber Says Sexual Assaults Are Down but Rate of Traffic Deaths is Up*, N.Y. Times (Jun. 30, 2022), https://www.nytimes.com/2022/06/30/business/uber-safety-report.html.

[45] *Uber's Emergency Button and the Technologies Behind It*, Uber Blog (Mar. 31, 2022), https://www.uber.com/blog/ubers-emergency-button-and-the-technologies-behind-it/.

[46] *Id.*

the case of a dangerous passenger where a driver is physically driving a car and cannot exit the vehicle, there is little reason to believe that the driver would be able to use the Emergency Button. This inability to use the Emergency Button in a situation where the driver's life is in jeopardy provides the driver with little to no protection or assistance.

69.     Uber also employs a featured called "RideCheck" to monitor the status of an Uber fare. RideCheck uses GPS location data to detect if a trip goes "unusually off course."[47] If RideCheck determines that something may have gone wrong, it prompts both the driver and rider with a notification asking if everything is "OK."[48]

70.     When RideCheck is initiated, the driver or passenger can let Uber know everything is okay, or they can take other actions such as using the Emergency Button or reporting the issue to Uber's Safety support team.[49]

71.     However, like the Emergency Button, RideCheck is fundamentally flawed as it requires a driver to have control of their phone and be able to safely use it. When confronted with a dangerous passenger inside a moving vehicle with no ability to exit, RideCheck is effectively unusable. Further, RideCheck only engages once a driver is already in an unsafe position; it is far from a real solution that would actually prevent drivers from being put in unsafe situations to begin with.

---

[47] *RideCheck: Connecting You with Help When You Need It*, Uber Newsroom (Sept. 17, 2019), https://www.uber.com/newsroom/ridecheck/#:~:text=RideCheck%20proactively%20surfaces%20tools%20riders,for%20our%20customers%20and%20partners.
[48] *Id.*
[49] *Id.*

**C.      Calvin Crew's History of Violent Crimes Involving a Firearm Indicated that He Was a Dangerous Passenger.**

72.      Ms. Spicuzza's assailant, Calvin Crew, had a history of violent firearm-related crimes.

73.      Before murdering Ms. Spicuzza, Mr. Crew had previously been adjudicated for robbery and theft stemming from a 2014 incident when he was 14 years old and was listed by the Pennsylvania State Police as a delinquent.[50] The statute under which Mr. Crew was charged outlaws the possession of a firearm following adjudication on certain serious offenses committed as a juvenile.[51]

74.      Despite his delinquent status, Mr. Crew tried to purchase a firearm in September 2021.[52] When trying to buy the weapon, Mr. Crew lied about his previous conviction.[53]

75.      As a result of his improper attempt to purchase a firearm, an arrest warrant was issued for Mr. Crew on December 8, 2021, for unsworn falsification to authorities and sale or transfer of firearms while unauthorized.[54]

76.      That arrest warrant was still pending when he killed Ms. Spicuzza only two months later.[55]

---

[50] Alyssa Choiniere, *Calvin Crew, Suspect in Killing of Uber Driver: 5 Facts you Need to Know*, Heavy (last updated Feb. 19, 2022), https://heavy.com/news/calvin-crew/.
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] Choiniere, *supra* note 50.
[55] Affidavit of Probable Cause, *Commonwealth v. Crew*, CP-02-CR-0002676-2022 (Ct. Com. Pl. Allegheny Cty.), at 4, attached hereto as **Exhibit B** ("Affidavit of Probable Cause"); *see also Commonwealth v. Crew*, MJ-05212-CR-0000253-2021 (Pa. Ct. Com. Pl., Allegheny Cnty.).

**D.      Christina Spicuzza Was Murdered As A Result Of Uber's Failure To Use Its Superior Knowledge, Resources, And Technological Capabilities To Protect Her From A Foreseeable Attack.**

77.      Christina Spicuzza, or Christi, as she was known to her family and friends, was a loving 38-year-old mother. She lived in Turtle Creek, Pennsylvania with her longtime fiancé and their four children.

78.      At the time of her death, Ms. Spicuzza had been driving for Uber for approximately one year to help provide for her family. She often worked four to five days per week.

79.      On the night of February 10, 2022, Ms. Spicuzza left her home to drive for Uber in a Nissan Sentra that she rented through Uber's "Vehicle Marketplace" program. Neither the Nissan Sentra nor any of the vehicles available from the Uber Vehicle Marketplace contained any safety devices to protect Ms. Spicuzza from her passengers.

80.      That same night, Calvin Crew, a 22-year-old man with a significant history of felony convictions, an outstanding warrant at the time of the Uber fare, and illegally in possession of a loaded handgun, asked his girlfriend, Tanaya Mullen, to order him an Uber ride to take him from his home on Brinton Road in Pitcairn, Pennsylvania to Pershing Street in Penn Hills, Pennsylvania.[56]

81.      A little before 9:00 p.m., Ms. Mullen ordered Mr. Crew an Uber ride using her Uber account and paid for the trip using her Apple Pay Account.[57]

---

[56] Affidavit of Probable Cause, *supra* note 55, at 4.
[57] *Id.*

82.     Uber fatefully matched Mr. Crew with Ms. Spicuzza. Within an hour and 15 minutes of picking up Mr. Crew, Ms. Spicuzza would be shot to death and her body left in a wooded area of Rosecrest Drive in Monroeville, Pennsylvania.[58]

83.     Despite ordering the Uber for Mr. Crew, not herself, and having the option to select Uber's "request a ride for someone else" feature, Ms. Mullen opted to order the Uber in her own name instead of Mr. Crew's name, entitling Mr. Crew to a sense of anonymity. As such, Ms. Spicuzza did not know Mr. Crew would be getting into her car that evening as opposed to Ms. Mullen.

84.     On or around 9:15 p.m. Ms. Spicuzza arrived at Brinton Avenue and Mr. Crew appeared at the side of the car wearing dark clothing, a hood, and a face mask (required by Uber due to the COVID-19 pandemic) covering Mr. Crew's face where only his eyes were visible.[59] Upon entering the vehicle, Ms. Spicuzza turned around and asked Mr. Crew, "For Tanaya," but Mr. Crew did not respond, but entered the vehicle.[60] Mr. Crew was Ms. Spicuzza's very first passenger ride of the night.

85.     If Uber had properly equipped Ms. Spicuzza with passenger verification data, she could have been alerted that Mr. Crew was not the requesting rider and that he had a criminal history.

86.     If Uber permitted its drivers to decline passengers for any reason without incurring any penalties or loss of incentives, Ms. Spicuzza would not have felt pressure to allow Mr. Crew into her car.

---

[58] Paula Reed Ward, *Death Penalty Option Remains Against Man accused of Killing Uber Driver*, TribLive (Jun. 16, 2022), https://triblive.com/local/monroeville/death-penalty-option-remains-against-man-accused-of-killing-uber-driver/.
[59] Affidavit of Probable Cause, *supra* note 55, at 8.
[60] *Id.*

87.     During the Uber ride, Ms. Mullen sent a text to Mr. Crew stating, "Whatever you doing tonight be careful."[61] Mr. Crew later responded "I'm not going to jail if we get caught."[62]

88.     Around 9:30 p.m., the car neared the destination Ms. Mullen had input in the app, and Ms. Spicuzza's Uber app announced, "Drop off Tanaya."[63]

89.     Instead of exiting the vehicle, Mr. Crew produced a handgun, leaned forward from the back seat, grabbed Ms. Spicuzza's hair, placed the handgun on the back of her head, and ordered her to "complete the trip."[64]

90.     After Mr. Crew drew the gun, Ms. Spicuzza began pleading with Mr. Crew to let her go stating, "I have a family" and "I'm begging you, I have four kids," to which Mr. Crew responded, "I got a family too, now drive."[65]

91.      At 9:34 p.m., Mr. Crew grabbed Ms. Spicuzza's cellphone and dashboard camera from the car's front dash and stated, "Do what I say and everything will be alright."[66]

92.     While at gunpoint, Mr. Crew forced Ms. Spicuzza to drive through several neighborhoods.[67] During this time, Mr. Crew attempted to rob Ms. Spicuzza by trying to access several banking and payment mobile applications on her phone.[68]

93.     Around 10:20 p.m., Mr. Crew ordered Ms. Spicuzza to stop driving near Rosecrest Drive in Monroeville, Pennsylvania, and to get out of her car.[69]

---

[61] *Id.* at 7.
[62] *Id.*
[63] *Id.*
[64] *Id.* at 8-9.
[65] *Id.* at 9.
[66] *Id.*
[67] *Id.* at 3-4.
[68] *Id.* at 3.
[69] *Id.* at 4.

94.     Mr. Crew then led Ms. Spicuzza into a wooded area where he proceeded to shoot her one time in the back of the head, killing her.[70]

95.     Mr. Crew then returned to Ms. Spicuzza's vehicle, put it in drive, and drove it back towards his home, leaving Ms. Spicuzza's body near Rosecrest Drive.[71]

96.     Mr. Crew then disposed of Ms. Spicuzza's cellphone, her car's dashcam, and her vehicle.[72]

97.     The following day, February 11, 2022, Ms. Spicuzza's fiancé, Brandon Marto, reported her missing because she never came home from work and he had not heard from her since she picked up a passenger around 9:00pm the previous night.[73]

98.     That same night at around 10:54 p.m. Ms. Mullen sent Mr. Crew a message stating "Im not going to jail if we get caught."[74]

99.     On February 12, 2022, the police found Ms. Spicuzza's body.[75] After a postmortem examination, the police determined that Ms. Spicuzza died late Thursday (February 10th) or early Friday (February 11th) from a gunshot wound she sustained to her head and further concluded that the manner of death was a homicide.[76]

---

[70] *Id.*

[71] Megan Tomasic, Megan Guza & Ryan Deto, *Uber Driver Killed, Left in Monroeville Pleaded For Life During Robbery, Policy Say*, TribLive (Feb. 17, 2022), https://triblive.com/local/penn-hills/police-charge-penn-hills-man-in-the-death-of-an-uber-driver-in-monroeville/.

[72] *Id.*

[73] Affidavit of Probable Cause, *supra* note 55, at 2.

[74] *Id.* at 7.

[75] *Id.* at 2.

[76] *Id.* at 3

100.    An arrest warrant was later issued for Mr. Crew and the police apprehended him on February 17, 2022.[77] Mr. Crew was charged by the Allegheny County District Attorney's Office with criminal homicide, robbery, robbery of a motor vehicle, carrying a firearm without a license, persons not to possess or use a firearm, and tampering with evidence.[78] Mr. Crew is currently facing the death penalty.[79]

101.    Had Uber applied its driver background check procedures to passengers, used its massive data analysis capabilities to screen out dangerous passengers, permitted drivers to cancel suspicious fares without penalty, or simply provided basic safety features in Ms. Spicuzza's Uber-approved rental car, these simple and effective measures—all readily available to Uber—could have saved Ms. Spicuzza's life.

102.    Unfortunately, however, Uber knew the dangers its drivers faced from dangerous, unverified passengers like Mr. Crew, and chose to do nothing, evincing a conscious corporate attitude for "profits over people," leaving behind Ms. Spicuzza's family to grieve her tragic and preventable death.

## CLAIMS FOR RELIEF

### COUNT I
**Wrongful Death Action**
**(Against all Defendants)**

103.    The paragraphs above are incorporated herein by reference.

---

[77] *Penn Hills Man in Custody After Uber Driver Found Shot, Killed in Monroeville*, WTAE (last updated Feb. 18, 2022), https://www.wtae.com/article/body-found-in-monroeville-is-that-of-missing-woman/39060553.

[78] Affidavit of Probable Cause, *supra* note 55, at 1.

[79] Paula Reed Ward, *Prosecutors to Seek Death Penalty Against Man Accused of Killing Uber Driver in Monroeville*, TribLive (Apr. 28, 2022), https://triblive.com/local/penn-hills/prosecutors-to-seek-death-penalty-against-man-accused-of-killing-uber-driver-in-monroeville/.

104.    Plaintiff brings this action as the personal representative of the Estate of Christina Spicuzza, pursuant to 42 Pa. Cons. Stat. § 8301(a) and Pa. R. Civ. P. 2202(a).

105.    During her lifetime, decedent Christina Spicuzza did not commence any action to recover damages for the injuries that caused her death, and no other action has been filed to recover damages for her wrongful death.

106.    The persons entitled to recover damages for Wrongful Death are as follows:

a.      Brandon Andrew Marto, Jr. Spicuzza, 322 Albert Street Turtle Creek, PA 15145, Son;

b.      Scott Marto, 322 Albert Street Turtle Creek, PA 15145, Son; and

c.      Victoria Marto, 322 Albert Street Turtle Creek, PA 15145, Daughter.

107.    All potential beneficiaries have been provided notice of the filing of this Wrongful Death and Survivor action.

108.    Uber owed a duty of care to Christina, a designated Uber driver operating an Uber-approved vehicle through Uber's own rental marketplace and a user of its technology platform for matching riders to drivers for the financial gain of Uber. Due to Uber's algorithm matching capabilities, Uber exercises a degree of control over who enters a driver's vehicle. There are foreseeable risks and dangers for Uber drivers when the app allows un-screened, unverified strangers into an enclosed space like a vehicle. Unlike a house or public place, a driver in a car is confined to their seat- they do not have the ability to attempt to evade an incoming threat or attack. Instead, the driver must remain vigilant to the road in front of them, which ultimately means they must take their eyes and focus off of the passenger seated directly behind them or beside them, leaving them especially vulnerable to attacks occurring within the vehicle.

109.    The potential threat Uber drivers face from dangerous passengers when using the Uber platform is known by Uber as evinced by Uber's own safety research. Despite this knowledge, Uber continues to refuse to protect its drivers through reasonable, appropriate, and accessible screening measures, allowing foreseeable risks and dangers to continue to put the lives of its drivers in needless jeopardy.

110.    Uber could easily fulfill this duty in a commercially reasonable and ordinary manner by applying the same screening standards it currently applies to its drivers to its passengers, as well as verifying who is ordering the ride. Currently, Uber collects driver history and criminal records (where allowed), license status, known aliases, prior addresses, and right to work information on their drivers, and verifies their identities for the protection of riders, but chooses to collect none of this information from its passengers despite the necessity for the safety and protection of its drivers.

111.    It could also fulfill this duty by using its massive data collection and analysis capabilities to predict and screen out potentially dangerous users. Instead, Uber simply chooses not to do so.

112.    Uber could further fulfill this duty by equipping vehicles rented through Uber's Vehicle Marketplace with basic and effective safety features such as a physical partition separating the driver from passengers, but failed to do so.

113.    While failing to take reasonable care to keep dangerous and/or violent criminals off its platform, Uber's practices penalize drivers for making decisions based on safety concerns and incentivizes them to override those concerns, creating a riskier environment for its drivers.

114.    Here, Uber breached its duty of care by failing to use readily available technology to screen out a criminal passenger that had a violent history of firearm and robbery charges, for

failing to verify the rider's identity prior to matching them with a driver, and by failing to provide or require basic safety features in vehicles rented through Uber's own Vehicle Marketplace.

115.    Uber also breached its duty of care by not providing Ms. Spicuzza the information to make an informed and meaningful choice of whether she would pick up an individual with such a history as Mr. Crew. Ms. Spicuzza was made to fear the ramification for declining a ride, causing her to accept Ms. Mullen's ride request for Mr. Crew and allow Mr. Crew into her car, despite his unknown identity, who then tragically killed her.

116.    As a direct and proximate result of Uber's failure (1) to screen out Mr. Crew or verify his identity before he entered Ms. Spicuzza's vehicle; (2) to provide any relevant information to Christina Spicuzza about his criminal history, which would have allowed Ms. Spicuzza to make a decision that could have saved her life; and (3) to provide Ms. Spicuzza with basic safety features, Uber matched Ms. Spicuzza with a criminal who then held Ms. Spicuzza at gunpoint, forced her to beg for her life, robbed her, and shot her in the head, killing her.

117.    As a direct and proximate result of the wrongful death of Ms. Spicuzza, her minor children Drew Spicuzza, Scotty Spicuzza, and Tori Spicuzza, suffered a loss of pecuniary benefits, entitling them to the following damages and losses, including but not limited to:

   a)    Deprivation of the reasonably expected support and income of their mother, Christina Spicuzza;

   b)    Deprivation of the companionship, cooperation, affection, comfort, services, society, assistance, care, guidance, teaching, training, advice, education, tutelage, emotional support, and moral upbringing of their mother, Christina Spicuzza;

   c)    Expenses for estate administration of Christina Spicuzza; and

28

    d)      All other damages permissible under the Wrongful Death Act, 42 Pa. Cons. Stat. § 8301.

118.    As a direct and proximate result of Uber's negligence, Plaintiff is entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

### COUNT II
**Survival Action – Negligence**
**(Against all Defendants)**

119.    The paragraphs above are incorporated by reference as if set forth fully herein.

120.    Plaintiff brings this action as the personal representative on behalf of the Estate of Christina Spicuzza, pursuant to 42 Pa. Cons. Stat. § 8302.

121.    Uber's breach of its duty of care to Ms. Spicuzza, as described above, was a direct and proximate result of its negligence, causing Ms. Spicuzza to suffer great physical pain and mental anguish when she was held at gunpoint and later shot to death.

122.    As a direct and proximate result of its negligence, Uber is liable for the following damages and losses, including but not limited to:

    a)      Christina Spicuzza's pain and suffering; mental torment and anguish; and loss of enjoyment of life;

    b)      Christina Spicuzza's lost wages; total estimated future earning power less her estimated cost of personal maintenance; loss of retirement and Social Security income;

    c)      All other financial losses suffered as a result of Christina Spicuzza's death; and

    d)      All other damages allowed under the Survival Act, 42 Pa. Cons. Stat. § 8301.

123.    As a direct and proximate result of Uber's negligence, Plaintiff is entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to the Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.


Dated: September 7, 2023                         Respectfully submitted,


                                                 /s/ *Gary F. Lynch*
                                                 Gary F. Lynch
                                                 Jamisen A. Etzel
                                                 Nicholas A. Colella
                                                 **LYNCH CARPENTER, LLP**
                                                 1133 Penn Ave., 5th Floor
                                                 Pittsburgh, PA 15222
                                                 Telephone: (412) 322-9243
                                                 gary@lcllp.com
                                                 jamisen@lcllp.com
                                                 nickc@lcllp.com

                                                 *Counsel for Plaintiffs*